**F I L E D**
United States Court of Appeals
Tenth Circuit

**DEC 11 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DON SIGMON,

      Plaintiff-Appellant,

v.

COMMUNITYCARE HMO, INC., an
Oklahoma Corporation, doing business
as Community Care Behavioral Health
Services EAP; MITCHELL GODI, an
Individual,

      Defendants-Appellees.

No. 99-5196

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 97-CV-845)**

Steven R. Hickman, Frasier, Frasier & Hickman, Tulsa, Oklahoma for Plaintiff-Appellant.

Jon E. Brightmire (S. Douglas Dodd with him on the brief), Doerner, Saunders, Daniel & Anderson, L.L.P., Tulsa, Oklahoma for Defendant-Appellees.

Before **BALDOCK, EBEL,** and **MURPHY**, Circuit Judges.

**EBEL**, Circuit Judge.

Don Sigmon ("Sigmon") is an employee of the city of Tulsa, Oklahoma ("Tulsa" or "the City"). In June 1997, Sigmon was randomly selected to undergo testing for the presence of alcohol and narcotics in his bloodstream pursuant to a drug testing policy covering certain of Tulsa's employees. He tested positive for marijuana, and Tulsa conditioned his continued employment upon his completion of a substance abuse program recommended by CommunityCare HMO, Inc. ("CommunityCare"), a private corporation providing services to the City. CommunityCare and Mitchell Godi ("Godi"), an Employee Assistance Program counselor employed by CommunityCare, referred Sigmon to a substance abuse program which Sigmon objected to because of religious content which he found to be disagreeable. Sigmon claims he was thus faced with a choice between enduring repeated offensive religious experiences or losing his job with the City.

Sigmon sued CommunityCare, Godi, (collectively "the Appellees") and the City for conspiring to force him to undergo an offensive religious experience on threat of termination of his employment, in violation of 42 U.S.C. § 1983. The City settled with Sigmon, and consequently Sigmon proceeded with his claims against only CommunityCare and Godi. The district court granted summary

judgment for CommunityCare and Godi, holding that they did not act under color of state law as required by § 1983.[1]  Sigmon now appeals, and we AFFIRM.

## I.  BACKGROUND

A.    Tulsa's Drug and Alcohol Program and its Relationship with CommunityCare

The city of Tulsa maintains a policy designed to prevent drug and alcohol abuse by its employees.  Pursuant to this policy, Tulsa requires employees in safety-related or otherwise sensitive jobs to submit to random drug and alcohol testing.  Typically, employees who test positive are given the opportunity to retain their jobs by (1) passing a "return to work" test demonstrating they are free of drugs and alcohol; (2) submitting to additional periodic testing; and (3) successfully completing substance abuse treatment as provided through an Employee Assistance Program ("EAP") offered by Tulsa to help its employees cope with a variety of personal problems.

---

[1] The majority of the facts in this case are undisputed, and are derived either from the district court's findings of fact in its order dated September 22, 1997 issuing a temporary restraining order enjoining the City from commencing pre-termination proceedings against Sigmon, or from the allegations in the parties' pleadings, depositions, affidavits, and an evidentiary hearing conducted on September 19, 1997.  Because this appeal stems from a grant of summary judgment in favor of the two defendants, to the extent that any facts are disputed we have viewed them in the light most favorable to the plaintiff.  See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996).

In August 1992, Tulsa entered into a contract with CommunityCare[2] whereby CommunityCare was to act as an independent contractor providing substance abuse counseling and other services to Tulsa employees referred to it pursuant to Tulsa's EAP. The record shows that CommunityCare identified independent third-party health care providers to supply these services, and then referred Tulsa's employees to those providers for actual treatment. In most cases, CommunityCare recommended an intensive treatment program usually lasting for a period of several weeks, with periodic follow-up treatment for one year. Neither the contract itself nor the EAP program purported to modify Tulsa's existing disciplinary policies or to transfer any authority to discipline employees from Tulsa to CommunityCare.[3] CommunityCare has entered into numerous similar agreements with other public and private entities which it performs in substantially the same manner. CommunityCare's agreement with Tulsa remained in effect throughout the time of the events at issue in this lawsuit.

---

[2]The agreement was signed by CommunityCare's predecessor, CorpHealth of MidAmerica.

[3]The relevant portion of the EAP policy reads:

Nothing in this Employee Assistance Program is to be interpreted as constituting a waiver of management's rights to take disciplinary measures nor shall the program be interpreted as a waiver of the right of any employee to use the grievance procedure within the framework of existing policy.

(Aplt. App. at 128 ¶ 6.)

- 4 -

B.     CommunityCare's Actions with respect to Don Sigmon

On June 17, 1997, pursuant to its drug testing policy, Tulsa ordered Sigmon to submit to a random urinalyses to screen for drugs and alcohol. Soon thereafter, a doctor employed by Tulsa notified Sigmon that he had tested positive for marijuana, and Sigmon's supervisor, Don McGlory ("McGlory"), enrolled him in Tulsa's EAP. Sigmon concedes that he had smoked marijuana the evening before he took the test.

As an initial step in entering Tulsa's EAP, Sigmon and McGlory both signed a "Post-Rehabilitation Drug and Alcohol Testing Agreement" dated June 18, 1997 ("the Post-Rehabilitation Agreement"). The Post-Rehabilitation Agreement contains Sigmon's promise, as a condition of his continued employment, to undergo periodic additional drug testing. Further, Sigmon acknowledged that "any unsatisfactory cooperation, compliance or attendance with the Employee Assistance Program's contract provider . . . will result in the initiation of pretermination procedures and disciplinary action."

After signing the Post-Rehabilitation Agreement, Sigmon was sent to see Godi at CommunityCare for assessment and referral to treatment. Godi referred him to an intensive six-week substance abuse treatment program provided by Laureate Psychiatric Clinic and Hospital ("Laureate") which was based on a "12-Step" program of recovery. A devout Christian, Sigmon was offended by the

program's references to a self-defined "higher power" instead of the traditional Judeo-Christian figures of God and Jesus Christ, but he nevertheless completed his initial course of treatment.

After Sigmon completed Laureate's initial intensive treatment program, Godi and a Laureate counselor met with Sigmon and McGlory to inform Sigmon that he was being referred for an additional one-year course of follow-up treatment. Godi presented Sigmon with a form entitled "Return to Duty/Post Treatment Agreement" ("Return to Duty Agreement") that: (1) required Sigmon to undergo a "continuing care" program at Laureate and to attend a minimum of two meetings per week for a period of one year of either Alcoholics Anonymous ("AA") or Narcotics Anonymous ("NA"); (2) stated Sigmon "understood . . . that failure to comply with its terms may result in disciplinary action, up to and including termination of [his] employment;" and (3) incorporated the grievance and arbitration procedures of Tulsa's collective bargaining agreement to settle disputes arising under the Return to Duty Agreement. Laureate's AA and NA programs are both based on a "12-Step" method and advance religious ideas similar to those expressed in Laureate's more intensive program.

Both Sigmon and McGlory refused to sign the agreement, and Sigmon heatedly objected to the religious content of the programs. Sigmon alleges that Godi "mentioned" termination at least twice during this meeting. Godi stated in

his deposition that he told Sigmon it was his duty to report Sigmon's refusal to comply with the EAP to Tulsa, and concedes he might have told Sigmon his report could prompt Tulsa to begin pretermination proceedings pursuant to the Post-Rehabilitation Agreement Sigmon had entered into with Tulsa.

Godi reported Sigmon's refusal to attend AA and NA meetings to Tulsa's human resources department and participated in a meeting with McGlory and several members of Tulsa's human resources department to discuss possible disciplinary actions against Sigmon. The record shows that Godi may have recommended Sigmon be terminated in the interest of maintaining consistency in Tulsa's drug and alcohol disciplinary actions.

Based on this meeting, McGlory told Sigmon that he had a choice of either attending the meetings, facing termination hearings, or submitting to a formal reprimand and a 30-day suspension from his job. Sigmon continued in his refusal to attend the meetings, and the City began the paperwork necessary to institute hearings leading to Sigmon's possible termination. In response, Sigmon filed the present lawsuit.

C.    Procedural History

Sigmon sued Tulsa, CommunityCare, and Godi under the Civil Rights Act of 1871, 42 U.S.C. § 1983,[4] alleging that they conspired to force Sigmon to participate in an offensive religious program on threat of termination of his employment with Tulsa, thereby violating his rights under the First and Fourteenth Amendments.  Following an evidentiary hearing conducted on September 19, 1997, the district court entered a temporary restraining order enjoining Tulsa from taking any disciplinary action against Sigmon for refusing to participate in a 12-step program, and later issued a preliminary injunction covering the same conduct.  On August 11, 1999, the district court entered a consent judgment against Tulsa disposing of all of Sigmon's claims against Tulsa.

In July 1998, CommunityCare and Godi jointly filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, arguing that there is no dispute of material fact sufficient to establish that they acted under color of law as required under 42 U.S.C. § 1983.  The district court granted

---

[4]42 U.S.C. § 1983 provides in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

the Appellees' motion on September 16, 1998, and Sigmon filed a notice of appeal. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## II. DISCUSSION

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court pursuant to Fed.R.Civ.P. 56(c). See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir. 1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Kaul, 83 F.3d at 1212. If there is no genuine issue of material fact in dispute, then we must determine if the substantive law was correctly applied by the district court. See id.

> While the movant bears the burden of showing the absence of a genuine issue of material fact, the movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim. If the movant carries this initial burden, the non-movant may not rest upon its pleadings, but must set forth specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof. An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant.

- 9 -

Id. (citation omitted).

Sigmon alleges that Appellees conspired with Tulsa to violate § 1983 by forcing him to submit either to an unwelcome religious experience or to face disciplinary action. In this case, the sole issue before the court is whether Sigmon has shown there is a material question as to whether the Appellees acted under color of law for the purposes of § 1983.

Plaintiffs alleging a violation of § 1983 must demonstrate they have been deprived of a right "secured by the Constitution and the laws of the United States,"[5] and that the defendants deprived them of this right acting under color of law. Lugar v. Edmondson Oil Co., 457 U.S. 922, 930, 102 S. Ct. 2744, 73 L. Ed.2d 482 (1982) (citations omitted). "Thus, the only proper defendants in a Section 1983 claim are those who represent [the state] in some capacity, whether they act in accordance with their authority or misuse it." See Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995) (citations and quotations omitted). However, a defendant need not be an officer of the state in

---

[5]Perhaps because of the trial court's injunctive relief and its ultimate entry of a consent judgment against the City, Sigmon never faced formal termination proceedings and he retained his job with Tulsa. Therefore, a question exists as to whether Sigmon can meet the first prong of the inquiry set forth in Lugar. However, this issue was neither raised by the parties nor addressed by the trial court in its order granting the Appellees' motion for summary judgment. Therefore, for the purposes of this appeal, we assume without deciding that Sigmon has alleged facts sufficient to support a finding that he suffered a deprivation of rights under the constitution and laws of the United States.

order to act under color of state law for purposes of § 1983. See Dennis v. Sparks, 449 U.S. 24, 27, 101 S. Ct. 183, 66 L. Ed.2d 185 (1980); Adickes v. S.H. Kress & Co., 398 U.S. 144, 152, 90 S. Ct. 1598, 26 L. Ed.2d 142 (1970). Rather, courts have applied four separate tests to determine whether a private party acted under color of law in causing an alleged deprivation of federal rights: (1) the nexus test; (2) the symbiotic relation test; (3) the joint action test; and (4) the traditional public powers test or public functions test. See Gallagher, 49 F.3d at 1447. Because the gravamen of Sigmon's argument is that the Appellees conspired with Tulsa to violate his civil rights, thereby satisfying the joint action test, we confine our analysis to this issue.

Unlike the usual case in which a plaintiff attempts to hold a public official or entity responsible for the acts of a private party, Sigmon here seeks to impose liability against private parties for the harmful actions of a public entity – that is, for Tulsa's threat to terminate him for not participating in CommunityCare's recommended treatment. Cf. National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 192, 109 S.Ct. 454, 102 L.Ed. 469 (1988) (plaintiff sought to impose § 1983 liability against NCAA, a private entity, after he was suspended from his job by a state university for violating the NCAA's standards for recruiting student athletes). Thus, we are required to "step through an analytical looking glass" to resolve the case by considering whether Tulsa's act of

- 11 -

threatening discipline against Sigmon in reliance on the Appellees' report and recommendation converts the Appellees' conduct into state action.  Id. at 193.

Sigmon alleges that the Appellees acted under color of state law because they conspired with Tulsa to violate his constitutional rights by referring him to the objectionable treatment program, and then recommending that Tulsa fire him for failing to participate.  In Adickes, the Supreme Court held that, "[t]o act under color of law does not require that the accused be an officer of the state.  It is enough that he is a willful participant in joint activity with the State or its agents." 398 U.S. at 152 (quotations and citations omitted).  This circuit has held that one way to prove willful joint action is to demonstrate that the public and private actors engaged in a conspiracy.  See, e.g., Anaya v. Crossroads Managed Care Systems, 195 F.3d 584, 596 (10th Cir. 1999); Hunt v. Bennett, 17 F.3d 1263, 1268 (10th Cir. 1994).  When a plaintiff seeks to prove state action based on a conspiracy theory, "a requirement of the joint action charge . . . is that both public and private actors share a common, unconstitutional goal."  See Anaya, 195 F.3d at 596.  Moreover, "the pleadings must specifically present facts tending to show agreement and concerted action."  Hunt, 17 F.3d at 1268.  In this case, Sigmon has failed to present sufficient evidence of agreement and concerted action to overcome the Appellees' motion for summary judgment.

Anaya provides a helpful example of this circuit's application of the joint action or conspiracy test. In Anaya, we reversed a lower court's order of summary judgment for the defendant because of evidence that Crossroads Managed Care Systems, an HMO interested in establishing a detoxification center in the city of Trinidad, Colorado, persuaded local law enforcement agencies to increase dramatically their alcohol-related arrests, even to the extent of utilizing unconstitutional arrests by the city police, and then to refer arrestees to the detox center run by Crossroads. See Anaya, 195 F.3d at 587-89. The plaintiffs in Anaya presented evidence that Crossroads had appointed city law enforcement officials to serve on an advisory panel created to help establish the center, and that a Crossroads executive helped the city officers formulate police department policies causing arrests for public intoxication and similar offenses nearly to double. See id. at 596-597. In remanding the case for trial, we emphasized:

> . . . Crossroads' mere lack of concern or even recklessness for causing the violation of others' constitutional rights would not seem to rise to the level of establishing Crossroads' liability under section 1983. What might establish liability, however, is Crossroads' role in creating the unconstitutional detention policy that led to the allegedly illegal unconstitutional seizures.

Id. at 597.

In contrast, in Gallagher, we held that a concert promoter who rented a state university's stadium and then conducted illegal pat-down searches of concert goers did not act under color of law. See 49 F.3d at 1455. Although we accepted

- 13 -

that the promoter and university likely shared common goals of hosting a successful concert, we held that this was insufficient to establish a conspiracy to violate patrons' civil rights. See id. Rather, the plaintiffs must show that the promoter and university specifically shared a common goal that the pat-downs themselves take place. See id.

Sigmon urges that a jury could find that Appellees engaged in a conspiracy to violate his civil rights because they referred Sigmon to a religiously-based treatment program and then reported his non-compliance to the City, aware that this would likely prompt Tulsa to begin termination proceedings. Sigmon notes that Godi "mentioned" termination during his meeting with Sigmon to persuade him to attend a 12-step program, participated as CommunityCare's representative in a meeting which led to Tulsa's decision to institute termination proceedings, and may have urged that Sigmon be terminated during that meeting.

These facts fail to satisfy the joint action test for state action. Reliance on these factors alone misses the fundamental point that Tulsa retained complete authority to enforce its drug policy, while the Appellees merely acted as an independent contractor in identifying and referring employees to treatment services. It is true that the Appellees could reasonably have foreseen that their actions might trigger Tulsa to begin termination proceedings against Sigmon. This fact does not, however, demonstrate that they performed their contract obligations

with the objective of utilizing Tulsa's employment authority over Sigmon to force Sigmon unconstitutionally to engage in unacceptable religious practices.[6]

Sigmon relies on the fact that Godi mentioned termination as a possible consequence of his failure to attend the 12-step meetings. However, this only restated the obvious, as Sigmon was already aware of the possible consequences of his refusal based on his Post-Rehabilitation Agreement with Tulsa. The Return to Duty Agreement that Godi presented to Sigmon merely repeated these terms and incorporated Tulsa's formal grievance and arbitration procedures to resolve disputes arising from the agreement. Thus, even if Godi verbally told Sigmon he could be terminated for refusing to attend 12-step meetings, the circumstances of the conversation and the language of the Return to Duty Agreement remove any suggestion that the Appellees could discipline Sigmon on their own initiative.

Godi's admission that he may have advised Tulsa to terminate Sigmon rather than deviate from its established drug policies does not change this

---

[6]We note that a private party who intentionally tailors its performance under a contract to assist a state in causing a constitutional deprivation–for example, an accounting firm that assisted a state actor in concealing racial discrimination in its employment practices–might well be considered to have acted under color of state law. See Malak v. Associated Physicians, 784 F.2d 277, 281-282 (7th Cir. 1986) (private association of physicians providing services to a public hospital were acting under color of state law for purposes of § 1983 when they conspired with the hospital to fire the plaintiff because of his criticism of hospital procedures). In the present case, however, there is nothing to suggest that the Appellees deviated in any way from how they have performed similar services for a variety of state and private clients.

analysis. At most, the record permits an inference that Tulsa might have considered Godi's advice as a factor in its ultimate decision to discipline Sigmon. But it is clear that Tulsa acted independently in making its final decision, and therefore no meeting of the minds occurred on this point. At most, Godi's advice was simply one component leading to Tulsa's ultimate decision.

Finally, Sigmon's brief suggests without further analysis that, even if the Appellees did not directly conspire to violate his civil rights, they conspired to "accomplish a legal result by illegal means." (Aplt. Br. at 13.) In other words, he contends that the agreement to provide drug treatment programs to Tulsa's employees may have been lawful, but the means employed – forcing employees with religious objections to submit on threat of termination – was unlawful. But, there is no evidence that CommunityCare undertook any unlawful act in fulfilling its side of the contract, or that Tulsa was required to engage in unlawful acts to satisfy its own end of the bargain. Rather, the evidence shows that the threat of termination for failing to participate in Tulsa's EAP was designed and carried out on Tulsa's initiative and authority.

## III. CONCLUSION

We find that Sigmon failed to put forth sufficient evidence of a conspiracy or joint action to show that the Appellees acted under color of law, as is required for liability under 42 U.S.C. § 1983. We therefore AFFIRM the district court's

order granting summary judgment to CommunityCare and Godi, and dismiss the

plaintiff's claims against those defendants.